IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WEIS BUILDERS, INC., | ) |
| Plaintiff, | ) ) ) |
| | ) No. 15 C 2619 |
| v. | ) |
| | ) Judge Jorge L. Alonso |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 150, | ) ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Weis Builders, Inc. ("Weis"), seeks a declaration that it need not pay a grievance award to defendant International Union of Operating Engineers, Local Union No. 150 ("Local 150"), because it terminated its collective bargaining agreement with Local 150 several years ago. Local 150 has counterclaimed, seeking to enforce the grievance award. The parties have filed cross-motions for summary judgment. For the reasons set forth below, Weis's motion is granted, and Local 150's motion is denied.

**BACKGROUND**

Weis is a construction management firm and general contractor that performs construction work throughout the country, including in Illinois. Local 150 represents heavy equipment operators, mechanics, and similar employees in the construction industry throughout northern Illinois, eastern Iowa and northwestern Indiana.

Local 150 negotiates a master agreement known as the Heavy Highway and Underground Agreement ("HHUA") with the Mid-America Regional Bargaining Association ("MARBA"), a multi-employer association that bargains with labor organizations on behalf of commercial

construction contractors. On August 14, 2000, Weis executed a Memorandum of Agreement ("MOA") with Local 150, by which Weis became a signatory to the HHUA.

When it signed the MOA in August 2000, Weis employed only one member of Local 150, who remained employed only until the following month, and Weis did not replace him. In subsequent years, Weis increasingly relied on subcontractors to supply the labor required to complete its projects in the Chicagoland area.

Beginning in March 2007, Weis participated in the construction of a Wal-Mart in Zion, Illinois. Superintendent Vernon Gibson and Assistant Superintendent Andrew Haney, both Weis employees, were based at the Zion job site. Gibson and Haney are not members of Local 150.[1] Weis rented equipment that it and its subcontractors would need at various stages of the project. The rented equipment included a generator, a number of heaters, and an all-terrain forklift known by its brand name, "Lull," which served a number of purposes, including unloading trucks at job sites.

In the early stages of the project, during the thirty to sixty days that the generator was required, Gibson and Haney would turn the generator on when they arrived in the morning and turn it off when they left the site for the evening. They did not perform service or maintenance work on the generator, nor did Weis employ any operator to "man" the generator, or continuously monitor it and provide service or maintenance as necessary.

From October 29, 2007 to December 10, 2007, the heaters ran twenty-four hours a day, seven days a week. Haney and Gibson did not operate, service or maintain the heaters, nor did Weis employ any operator to man the heaters.

Weis rented the Lull at the Zion job site from June to December 2007. Haney testified at

---

[1] In this Order, the Court will also refer to members of Local 150 as "operating engineers" or "operators."

his deposition that, when Weis needed an operating engineer to operate the Lull, its typical practice was to ask one of its subcontractors to direct a Local 150 operator who was employed onsite to perform work for Weis for the day, and the subcontractor would later bill Weis for the wages it paid the operator that day. Weis sought an operator from one of its subcontractors about fifteen to twenty times during the course of the Zion project. On some occasions, when Weis received small, off-schedule deliveries and no operating engineer was readily available, Haney and Gibson would use the Lull to remove a pallet or two of material from a delivery truck. Haney operated the Lull four to five times, and Gibson operated the Lull ten to fifteen times at the Zion project. A Local 150 business agent told Gibson and Haney that only a Local 150 member was permitted to operate the Lull, and after that point Haney "stayed off" the Lull, although he testified that he saw Gibson use it "every now and then." (Local 150 LR 56.1(a) Stmt., Tab 3, Haney Dep., 81:3-4, ECF No. 29-4.)

On November 3, 2007, Local 150 business agent Vince Zajec brought a grievance against Weis for hiring non-HHUA-signatory subcontractors at the Springbrook project in Naperville, Illinois. The parties settled the grievance in January 2008.

In February 2008, Zajec filed another grievance against Weis for running unmanned generators and heaters at the Springbrook project. At Springbrook, as at the Zion project, Weis rented generators and heaters from a vendor, but it did not direct any employee or subcontractor to maintain or service them  The vendor installed the machines, turned them on, and left them running at the job site indefinitely. According to Zajec's grievance, Weis was required to hire an operating engineer to man the machines. The union ultimately did not pursue the grievance against Weis, and no binding decision or settlement was ever made.

At about the same time, Haney left the Zion project and went to work for Weis at another

3

Wal-Mart construction project in Gurnee, Illinois. Haney testified at his deposition that Weis ran a few unmanned heaters twenty-four hours a day at the Gurnee project, as at Springbrook.

On December 4, 2008, Leonard L. Burridge, General Counsel for Weis, sent a letter informing Local 150 that Weis was terminating the MOA, and therefore would not be bound by the HHUA, because Weis had "not directly employed operating engineers since signing the [MOA] and [did] not intend to hire any operating engineers to perform work within the scope of work of the [HHUA] in the future." (*See* Weis LR 56.1(a) Stmt. App., Ex. U, ECF No. 27-22.) Dale D. Pierson, General Counsel for Local 150, responded in a letter that the "relevant inquiry" is not whether Weis employs Local 150 members but "whether any [Weis] employees perform work covered by" the HHUA, and "[s]hould [Weis] perform any work within the scope of work of the [HHUA], Local 150 will utilize all legal remedies available to it to ensure [Weis's] compliance with the terms of the [HHUA]." (*Id.*, Ex. V, ECF No. 27-23.) Burridge sent a second letter to reiterate Weis's position that Weis "has not, does not, and has no intention of utilizing any [Weis employees to] perform any work within the scope of work" of the HHUA. (*Id.*, Ex. W, ECF No. 27-24.) Pierson, in turn, replied that Local 150's position was that "the Agreement between Weis Builders and Local 150 [would] remain in effect" because the terms of the agreement gave Weis "no option to terminate" at that time. (*Id.*, Ex. X, ECF No. 27-25.)

In November 2014, Local 150 brought another grievance against Weis, alleging that Weis violated the HHUA by hiring non-signatory subcontractors at a project in Lombard, Illinois. Weis sent Local 150 a letter explaining its position that it had terminated its agreement with Local 150 in 2008 and it was no longer a signatory to the HHUA. The Joint Grievance Committee ("JGC"), a body composed equally of Local 150 and MARBA-member employer representatives that hears and decides union grievances, set a date to hear Local 150's grievance

4

against Weis. Weis sent another letter to inform Local 150 and the employer representatives on the JGC of Weis's position that it was not bound to any agreement with Local 150. Weis did not appear at the hearing, and the JGC sustained the grievance, directing Weis to pay $10,908.92 to the Local 150 Assistance Fund. After Local 150 sought to collect the award, Weis filed this action.

## ANALYSIS

The parties have filed cross-motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

Weis's position is that it properly repudiated the MOA and the HHUA in 2008 under the "one-man unit rule." Under Section 8(f) of the National Labor Relations Act, an employer in the construction industry may enter into "prehire agreements" with labor unions even before the employer hires any workers, rather than wait for a majority of employees to elect a union to

5

represent them. *See* 29 U.S.C. § 158(f). Prehire agreements are generally illegal, but Congress enacted section 8(f) to permit them in the construction industry because the transient, short-term nature of construction work meant that employers often had no stable workforce "employed by management in a continuing work relationship" that was "capable of designating a union representative or participating in a certification election." *See Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 772-73 (3d Cir. 1988). By sanctioning prehire agreements in the construction industry, Congress made it easier for contractors to estimate their labor costs before bidding on a project and for construction workers to obtain the influence over the terms and conditions of employment that union representation provides. *See id.*

However, because the purpose of a labor agreement is to govern *collective* bargaining, an employer may repudiate a prehire agreement with a union if it employs one or fewer members of the union, *see J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Local Union 1, AFL-CIO*, 398 F.3d 967, 973-75 (7th Cir. 2005); *Baker Concrete Constr., Inc. v. Reinforced Concrete Contractors Ass'n*, 820 F.3d 827, 831-32 (6th Cir. 2016), provided that the single-employee unit is a stable one, rather than a temporary one caused by the staffing fluctuations that commonly occur in the construction industry, *SAS Electrical Services, Inc.*, 323 NLRB 1239, 1252 (1997).

According to Weis, by the time of its December 4, 2008 letter to Local 150, it had not directly employed an operating engineer in eight years. Weis argues that it was therefore entitled to repudiate the agreement with Local 150 under the one-man unit rule, and, having done so, it has no valid contract with Local 150 that requires it to pay any sums the JGC may purport to award to Local 150 for any alleged grievance.

Local 150's position is that Weis's repudiation of the HHUA was ineffective because, even if Weis did not formally, directly employ any operating engineers in or around 2008, that was only because, in three different ways, Weis improperly and inequitably manipulated the size of the bargaining unit by using non-bargaining unit employees to do bargaining unit work that was within the scope of the HHUA. First, Weis procured operating engineers from its subcontractors in order to unload trucks, and because the subcontractors billed Weis for their work, Local 150 argues that these employees were effectively employees of Weis who should be counted as such for purposes of the one-man unit rule. Second, Haney and Gibson, both Weis employees, sometimes operated the Lull to unload trucks, which was bargaining-unit work that could only properly be performed by operating engineers, so, Local 150 argues, they should count as bargaining unit members for purposes of any one-man unit analysis. Third, Weis ran unmanned heaters and generators on a number of projects (namely, Zion, Gurnee and Springbrook) in 2007 and 2008, and Haney and Gibson operated the generator at the Zion project by turning it on in the morning and off in the evening; Local 150 argues that the HHUA required Weis to hire operating engineers to man the heaters and generators. Because Weis violated the HHUA in all of these ways in order to manipulate the size of the bargaining unit, Local 150 argues, Weis could not properly and equitably repudiate its agreement with Local 150 under the one-man unit rule. The Court will address individually the three theories of Weis's alleged manipulation of the size of the bargaining unit.

**A. Operating Engineers Procured By Subcontractors to Unload Trucks for Weis**

Local 150 argues that Weis was a "joint employer" of any operating engineers it procured from its subcontractors to unload trucks, based principally on the recent decision of the National Labor Relations Board ("NLRB") in *Browning-Ferris Industries of California, Inc.*, 362 NLRB

No. 186, 2015 WL 5047768, at *19 (Aug. 27, 2015). The NLRB held that "two or more entities are joint employers of a single work force if they are both employers within the meaning of the common law, and if they share or codetermine those matters governing the *essential terms and conditions of employment*." *Id.* (emphasis added). "Essential terms and conditions of employment" include such matters as hiring, firing, wages, discipline, supervision, direction, scheduling, seniority, overtime, work assignments, and the manner and method of work performance. *Id.*

The evidence in this case shows that Weis did nothing more than occasionally direct operating engineers whom its subcontractors had available to remove pallets of material from a delivery truck, and then reimburse the subcontractors for the cost of the operators' labor. The operators always remained on the subcontractors' payrolls, and Local 150 points to no evidence that, merely because a subcontractor might place an operating engineer at Weis's disposal for a few hours at Weis's expense, Weis had any power to control essential terms and conditions of the operator's employment such as hiring, firing, discipline, supervision, etc. At most, Weis occasionally had the power to indirectly pay certain operating engineers who had been designated by a subcontractor to put material that had been delivered to Weis where Weis told them to put it. (*See* Local 150 LR 56.1(a) Stmt., Tab 3, Haney Dep., 74:13-14, ECF No. 29-4 ("Take it off this truck and set it over there was about the extent of the direction.")) This is a far cry from *Browning-Ferris Industries*. In that case, the joint employers had a permanently intertwined relationship that permitted BFI, which did not formally employ the subject employees although they worked in BFI's facility, to impose hiring requirements and safety policies on them, to refuse to permit certain employees to work in its facility, to indirectly set the employees' pay, and to "exercise control over processes that shape the day-to-day work," 2015

8

WL 5047768, at *23. Local 150 has not demonstrated that Weis's relationship with its subcontractors and their employees was similar.

   B. **Haney and Gibson's Use of the Lull Forklift**

Local 150 argues that Weis may not rely on the one-man unit rule because Haney and Gibson performed bargaining unit work, in violation of the HHUA, by using the Lull to unload trucks.

   1. **"Construction of a building structure"**

According to Article I, Section 7 of the HHUA, the "scope of work" to which the HHUA applies includes such work as excavating, paving, highway construction, underground and utility work, wrecking, and "heavy construction work of all types." (HHUA, Article I, Section 7, at 5-6, ECF No. 8-2.) However, these "classifications of work and operations shall not be interpreted to include . . . *[c]onstruction . . . of a building structure* or structures." (*Id.*) (emphasis added)

Weis does not dispute, as a general matter, that operation of a forklift falls within the ambit of the HHUA. (Weis LR 56.1(b)(3)(B) Resp., ¶ 23, ECF No. 30 ("Weis Builders . . . admits that . . . forklift trucks are covered under the HHU agreement."); HHUA, Article XV, Section 1, at 55, ECF No. 8-2 (listing "forklift trucks" as one of the machines to which the "Class III" wage rate applies)). But Weis contends that Haney and Gibson's use of the Lull to unload trucks at the Zion construction site was part and parcel of the "construction of a building structure," and is therefore specifically excluded from the HHUA's scope of work.

Weis cites no other authority or evidence to support its interpretation of the contract language, and based only on the plain language of the contract, the Court fails to see how using a forklift to unload trucks at a building construction site qualifies as "construction of a building structure." Using heavy machinery such as a forklift to move building materials around a

construction site is not the same as assembling the materials into a building. Without stronger evidence or authority bearing on the question, the Court cannot accept the argument that the HHUA did not apply to the operation of the Lull in this case merely because the Lull was being used on a building construction site to support the construction project. *See generally Int'l Union of Operating Eng'rs, Local Union 965-965A-965B-965C-965RA v. Associated Gen. Contractors of Ill.*, 845 F.2d 704, 706-07 (7th Cir. 1988) (rejecting argument that applicability of operating engineers' agreement depended on whether the work was performed at a construction site).

### 2. Manipulation of bargaining unit

Because Weis has not demonstrated that Haney and Gibson's use of the Lull was outside the scope of work of the HHUA, the Court turns to the issue of whether Weis's use of non-bargaining unit employees to do bargaining unit work prohibits Weis from invoking the one-man unit rule. Local 150 argues that Weis has "unclean hands" because it only achieved a bargaining unit of fewer than two members by way of labor practices that violated the HHUA, and under those circumstances it would be inequitable to apply the one-man unit rule. (Local 150 Mem. Supp. Mot. Summ. J. at 7, ECF No. 28; *see* HHUA, Article I, Section 11, ECF No. 8-2 ("The Employer hereby agrees to assign <u>ALL</u> work that is to be performed in the categories described in Article I, Section 7, Article VIII, Article XI, and/or Article XV to employees in the bargaining unit covered by this Agreement.").)

But the cases Local 150 cites in support of its reasoning are not factually analogous to this one. Many of these cases involve employers who packed the bargaining unit with employees friendly to management in the run-up to a union election, with the intent to manipulate the size and composition of the bargaining unit so that the election would have the

10

employer's desired result. *See, e.g., NLRB v. Regency Grande Nursing & Rehab. Ctr.*, 462 F. App'x 183, 185-88 (3d Cir. 2012); *NLRB v. Apex Paper Box Co.*, No. 91-6189, 1992 WL 229294, at *5-6 (6th Cir. Sept. 17, 1992) (Kennedy, J., concurring) (unpublished table decision), *Golden Fan Inn*, 281 NLRB 226, 238 (1986); *Medline Indus., Inc.*, 233 NLRB 627, 652-53 (1977). Local 150 also cites *NLRB v. Galicks, Inc.*, 671 F.3d 602, 609 (6th Cir. 2012), in which an employer harboring demonstrated anti-union animus refused to recall laid-off journeymen, claiming that there was no work for them, while the employer was simultaneously hiring non-journeymen and giving them journeyman work.

But in this case, unlike in the above cases, the evidence does not support any inference that Weis acted in bad faith to undermine its employees' collective bargaining representative, or that it had any serious anti-union animus. Rather, the evidence tends to show, and Local 150 does not seriously dispute (*see* Local 150 LR 56.1(b)(3)(B) Resp. ¶¶ 28-30, ECF No. 33), that Weis procured operating engineers from its subcontractors when practicable and only used Haney and Gibson to unload small or unexpected deliveries of no more than a pallet or two on rare occasions when no subcontractor could readily provide an operating engineer on short notice, or when Haney and Gibson believed that no operating engineer was required because the work was minimal. (*See* Local 150 LR 56.1(a) Stmt. App., Tab 3, Haney Dep., 71:1-20, ECF No. 29-4.) Local 150 has not demonstrated that Weis avoided hiring Local 150 operators in order to manipulate the size of its work force as part of a plan to repudiate the HHUA in bad faith. *Cf. NECA-IBEW Pension Trust Fund v. Bays Elec., Inc.*, No. 08-CV-2133, 2011 WL 4435575, at *8 (C.D. Ill. Sept. 23, 2011) (employer who engages in "gamesmanship" by "laying off its employees to instantly become a 'one-man-unit'" may not take advantage of the "one-man rule"). Weis does not have unclean hands based on this relatively innocent conduct.

Local 150 also cites *SAS Electrical Services, Inc.*, 323 NLRB 1239, 1252 (1997), in which the NLRB held that an electrical contractor could not invoke the one-man unit rule "to escape what would otherwise be its obligation to honor its collective-bargaining agreements on the basis of a situation [*i.e.*, the absence of any employees who are bargaining unit members] created by a material breach of such agreements."[2] But the contractor in *SAS Electrical* hired five non-union electricians as its primary work force on a three-month light fixture retrofitting project, despite the fact that its collective bargaining agreement with the electricians' union specifically defined hiring non-union employees for union work as a "material breach." *Id.* at 1244, 1246-47. Cynically circumventing the union by hiring several non-union electricians to perform full-time electrical work for months, in clear breach of the collective bargaining agreement, does not compare to using two non-union employees already working at the job site to perform small tasks, sporadically occurring and easily accomplished, that the employees believed were too trivial to require hiring an operating engineer. Because the electrical contractor's misconduct is dissimilar to Weis's, *SAS Electrical* provides little support for Local 150's position.

In short, Local 150 cites no authority squarely supporting its argument that it would be inequitable to give effect to Weis's repudiation of the HHUA under the one-man unit rule because Haney and Gibson occasionally performed some bargaining unit tasks.[3] In fact, the weight of authority appears to be against Local 150's position. The NLRB has ruled that it does not "intend[] to take a mechanistic approach to the facts in order to determine when to apply the

---

[2] Local 150 also cites *Northern California Chapter, Associated General Contractors of America, Inc. (Operating Engineers, Local 3)*, 119 NLRB 1026, 1048 (1957), but that case dealt with the proper scope and application of a clause in a collective bargaining agreement that required the employer to hire only union subcontractors; the case is not directly on point and provides no direct support for Local 150's position.

[3] Both parties also discuss at some length whether Haney and Gibson were supervisors who were therefore exempt from inclusion in a bargaining unit under the National Labor Relations Act. For purposes of this Order, the Court assumes without deciding that Haney and Gibson were not supervisors in any relevant sense.

'one man unit' rule." *Searls Refrigeration Co.*, 297 NLRB 133, 135 (1989). In a recent case, the Sixth Circuit reasoned as follows:

> [Section] 8(f) agreements, by their very nature, are tentative and anticipatory. In fact, the Supreme Court stated that, "[a]bsent majority credentials, the collective-bargaining relationship and the union's entitlement to act as the exclusive bargaining agent [never mature." *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 267 (1983).] Section 8(f) agreements are intended to cover foreseeable groups of employees for short-term or interim construction projects where they would otherwise be unrepresented. When there have been no employees to represent for at least ten years, and will be no employees to represent in the foreseeable future—as it is undisputedly the case with Baker here—it is difficult to conceive of a reason to deny a contractor the right to terminate an agreement that was intended to be tentative, anticipatory, and conditional in the first place.

*Baker Concrete Constr., Inc. v. Reinforced Concrete Contractors Ass'n*, 820 F.3d 827, 832 (6th Cir. 2016). This reasoning applies equally to this case. It is undisputed that Weis had not directly hired any operating engineers in more than eight years, and there is no evidence to contradict its assertion that it had no plans to do so in 2008 or thereafter. Critically, unlike in many of the cases Local 150 has cited, *see, e.g., SAS Electrical*, 323 NLRB at 1252, there is no evidence that Weis used its employees to do bargaining unit work after the point at which it claims that the HHUA ceased to apply. Further, removing a pallet or two of material from a truck on, at most, 20 occasions, work that a single operator presumably could have performed in a matter of minutes, is essentially *de minimis*. *Cf. id.*; *see generally NLRB v. Ralph Printing & Lithographing Co.*, 379 F.2d 687, 691-92 (8th Cir. 1967) (recognizing that unfair labor practices claim against employer was subject to "the *de minimis* rule").

Weis argues that even if Local 150 is correct that Haney and Gibson's minimal bargaining unit work was substantial enough to preclude Weis from invoking the one-man unit rule, there is no evidence that Haney and Gibson performed any bargaining unit work at all after

December 2007, when the Lull was removed from the Zion construction site.[4] Weis did not repudiate its contract with Local 150 by invoking the one-man unit rule until December 2008, nearly a year later. Thus, for eleven months prior to repudiating the contract, Weis had a legitimately stable workforce of fewer than two bargaining unit members, and there is no evidence that any Weis employees performed bargaining unit work immediately afterward. Under these circumstances, there was a sufficiently stable unit of fewer than two bargaining unit members at the time Weis repudiated the HHUA; the facts were similar in *J.W. Peters*, 398 F.3d at 970. *See also Stack Elec.*, 290 NLRB 575, 577-78 (1988) (employers had employed more than one bargaining unit employee for only about two weeks over a three-year period, and not since more than four months before the hearing in that case); *cf. McDaniel Elec.*, 313 NLRB 126, 127 (1993) (no stable one-man unit because employer employed two employees during at least five of the thirteen weeks prior to the hearing).

To conclude that Weis cannot make use of the one-man unit rule under these circumstances would be to give it the "mechanistic" application that the NLRB has warned against. The bottom line is that Weis did not directly employ any operating engineers, nor, as a general matter, did it need to, because it was able to subcontract out substantially all of the work that the HHUA required operating engineers to perform, a practice the HHUA contemplates. At the time it repudiated its agreement to the HHUA, Weis employed fewer than two operating engineers, and it did not inequitably manipulate the size of the bargaining unit to reach that condition, which was stable and of long duration, by directing Haney and Gibson to operate the Lull.

---

[4] Local 150 also alleges that Haney and Gibson performed bargaining unit work by turning the Zion generator on in the morning and off in the evening. As the Court will discuss below, this is not bargaining unit work, but even if it were, the generator was only on the Zion construction site during the early stages of the Zion project, even before the Lull arrived, so the same logic applies.

### C. Heaters and Generators

Local 150 argues that Weis may not rely on the one-man unit rule because (1) Weis violated the HHUA by using unmanned heaters and generators on various projects, and (2) Haney and Gibson performed bargaining-unit work, in violation of the HHUA, by operating the generator at the Zion project.

In support of their position, Local 150 principally cites to Article XI, Section 1 of the HHUA, which reads as follows: "An operating engineer servicing and maintaining . . . Small Generators, . . . shall not be required to maintain more than a total of five (5) such machines . . . . When employees of the bargaining unit are employed to service and maintain mechanical heaters, such employees shall not be required to service and maintain more than a total of five (5) such heaters." (HHUA, at 36, ECF No. 8-2.) Local 150 also cites to Article XV, Section 1, which lists heaters and generators as machines to which the "Class IV" wage rate applies (*id.* at 56), and Article I, Section 1, which provides as follows:

> The bargaining unit shall consist of all employees engaged in work covered by the occupational jurisdiction of the Union with reference to any and all of the classifications described in Article I, Section 7, "SCOPE OF WORK," and Article XV, Section 1, "WAGE RATES AND FRINGE BENEFITS," wages, hours of work and all other terms and conditions of employment set forth in this Agreement and the operation, maintenance, repair, moving, dismantling and assembly of all machines used on work coming within the occupational jurisdiction of the Union.

(*Id.* at 2.) Further, Local 150 cites to Article I, Section 11, which provides that "[t]he Employer hereby agrees to assign ALL work that is to be performed in the categories described in Article I, Section 7, Article VIII, Article XI, and/or Article XV to employees in the bargaining unit covered by this Agreement." (*Id.* at 9.) Based on all these provisions, Local 150 argues that Weis was required to employ bargaining-unit members to operate the heaters and generators.

Weis responds that Article XI uses permissive, rather than mandatory, language to

15

address "servicing and maintaining" heaters, and neither in Article XI or elsewhere does the HHUA require operating engineers to attend heaters or generators that are in good working order and do not need any immediate service or maintenance. Rather, Weis argues, the HHUA merely requires Weis to hire operating engineers to perform service or maintenance if and when any such work becomes necessary.

In support of its position, Weis cites a 2009 arbitration decision denying Local 150's grievance against Scurto Cement Ltd. under the Illinois Building Agreement, a collective bargaining agreement between MARBA and Local 150 that complements the HHUA by covering "building construction," which the HHUA excludes. (*See* Weis Local Rule 56.1(a) Stmt., Ex. T, ECF No. 27-21.) In the Scurto Cement matter, as in this case, Local 150 accused a contractor of violating the collective bargaining agreement by running unmanned heaters brought to job sites by an outside vendor. The arbitrator concluded, based on contract language virtually identical to the language in Article XI, Section 1 of the HHUA, that Scurto Cement did not violate its contract with Local 150 by using unmanned heaters because neither the contract nor the circumstances required Scurto Cement to assign members of Local 150 to the operation of the heaters. The contract set forth certain requirements that the company had to meet *if* it assigned bargaining unit members to "service and maintain" the heaters, but it did not "mandate that Local 150 *must* be employed to operate" the heaters. (*Id.* at 23.) Rather, the contract only required the company to assign operating engineers to man the heaters in the exercise of its "reasonable discretion . . . based on the individual circumstances of the situation." (*Id.*) The heaters in question actually "required little, if any, ongoing servicing during operation," and any service or maintenance that was necessary could be performed by the outside vendor, in any event. (*Id.* at 23-24.) Scurto Cement was only required to assign operating engineers to man its

heaters if the circumstances reasonably dictated it, and it was not reasonably necessary to man the heaters under the circumstances that existed at the Scurto Cement job sites, so Scurto Cement did not violate the collective bargaining agreement with Local 150 by declining to man the heaters.

Local 150 replies by citing a myriad of cases for the proposition that arbitration decisions are not precedential. Further, Local 150 points out that the Scurto Cement decision was based on a different contract and dealt only with heaters, not generators.

The Court fully agrees with Local 150 that the Scurto Cement decision carries no substantive precedential weight, but nothing prevents the Court from considering whether the decision is persuasive by the force of its reasoning, and Local 150 identifies no flaw in the decision's reasoning. Local 150 attempts to distinguish the decision because it dealt with a different collective bargaining agreement, but the relevant contract language is virtually identical to the language of Article XI, Section 1 of the HHUA. Local 150 also attempts to distinguish the decision because it dealt only with heaters, but again there is little difference in the relevant language; Article XI, Section 1 discusses both heaters and generators in terms of "servicing and maintaining them," using essentially permissive language. Further, in this case, as in the Scurto Cement matter, there is no evidence that any ongoing service and maintenance was required; rather, the evidence showed that the machines were delivered to the job site by the vendor from whom they were rented, and they essentially ran undisturbed until they were no longer needed. Under these circumstances, there was simply no need for an operating engineer.

The only contrary evidence that Local 150 offers is the "supplemental certification" of Steven M. Cisco. (Local 150 LR 56.1(b)(3)(C) Stmt., Tab 20, ECF No. 34-1, at 44-46.) Cisco serves as Local 150's Recording-Corresponding Secretary, an elected officer of the union who

performs administrative duties on a full-time, salaried basis. (Local 150 LR 56.1(a) Stmt. App., Tab 13, ECF No. 29-15, ¶¶ 1-4.) In his supplemental certification, Cisco states as follows:

> It is necessary for a bargaining unit employee to man the mechanical ground heaters at all times during their operation. Specifically, an operator will check the oil, start it, maintain it, grease it, check the lines and radiator fluid, in addition to repairing it if needed. Should problems occur during its operation (*e.g.*, blown hoses, running out of fuel or oil) an operator can address the issue immediately and fix the problem. The constant presence of an employee is critical, since if these problems occur after working hours, the machine would shut down, and potentially disrupt the construction process, potentially costing the company time and money.

(*Id.*, ¶ 14.) This affidavit is insufficient to create a genuine issue of material fact. First, as Weis points out, it appears not to be based on personal knowledge. Although Cisco states that he worked as a Local 150 drill rig operator in 1980 and 1981, he does not claim to have any personal experience or expertise with the particular generators or heaters that Weis used in this case that might permit him to weigh in on whether these machines needed to be manned at all times. Further, although Cisco states his belief that employers must assign an operating engineer to man the heaters, or risk "disrupt[ing] the construction process," neither he nor Local 150 explains, and the Court fails to see, why an employer is not entitled to take that risk, if it calculates that the risk of the heaters malfunctioning is too low to justify hiring someone to monitor them. Cisco's statement concerning why it is prudent to man mechanical ground heaters at a construction site sheds no light on the meaning or application of the contract language at issue. Weis apparently did not hire operating engineers to man the heaters and generators because it judged that it did not need anyone to perform that task, and the Court fails to see how Weis thereby violated its contract with Local 150.

True, directing a non-bargaining unit employee to perform bargaining unit work is a different matter, but the only action that Local 150 alleges a non-bargaining unit member to have

18

performed with respect to a heater or generator is turning a generator on and off, which Haney and Gibson did each day in the early stages of the Zion project. The Court has already concluded that Weis could leave unmanned heaters and generators running twenty-four hours a day without running afoul of the HHUA, and it would be absurd to conclude that leaving heaters and generators running overnight did not violate the HHUA, but switching them off for the night did. It would be as if Weis had agreed with an electricians' union that Weis employees could not turn the lights on and off unless they were bargaining unit members. A more likely interpretation of the HHUA is that it specifically refers to "servicing and maintaining" generators and heaters because that is the work that the HHUA requires employers to hire an operating engineer to do, and switching a generator on or off does not fit that characterization. In any case, there is no evidence that any Weis employee has "operated" a generator in the way that Haney and Gibson did since mid-2007, and, as explained above, that means there was a stable bargaining unit of fewer than two employees at the time Weis repudiated the HHUA in December 2008.

## CONCLUSION

For the reasons set forth above, the Court grants Weis's motion for summary judgment [25] and denies Local 150's motion for summary judgment [24]. The Court declares that Weis is not obligated to pay the grievance award because it properly repudiated its contract with Local 150 under the one-man unit rule in 2008, without inequitably manipulating the size of the bargaining unit. Civil case terminated.

**SO ORDERED.**                                                   **ENTERED:** February 7, 2017

                                                                             **HON. JORGE ALONSO**
                                                                             **United States District Judge**